Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3916 | **DATE** | 8/24/2004 |
| **CASE TITLE** | Carroccia vs. Michael Anderson | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, the Court grants the defendants' motion for summary judgment (68-1, 80-1). The Clerk of Court is directed to enter judgment in favor of the defendants. The trial date of 11/1/04 is vacated.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | Document Number |
|---|---|---|---|
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | AUG 2 6 2004 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | 101 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| OR | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOHN CARROCCIA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 02 C 3916 |
| ) | |
| MICHAEL ANDERSON, TOM ) | |
| BUMGARNER, RONALD MALLOY, ) | |
| TOM ATCHISON, JOHN ROGULA, ) | |
| KANE COUNTY, ILLINOIS, and ) | |
| VILLAGE OF HAMPSHIRE, ILLINOIS, ) | DOCKETED |
| ) | |
| Defendants. ) | AUG 2 6 2004 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Following his acquittal by a jury on the charge that he had murdered Hampshire, Illinois police sergeant Gregory Sears, plaintiff John Carroccia sued certain of the police officers, municipal entities, and others involved in his arrest and prosecution. Specifically, Carroccia has sued Michael Anderson, a commander with the Kane County Sheriff's Police; Thomas Bumgarner, a lieutenant with that same police department; Thomas Atchison, the Hampshire chief of police; Ronald Malloy, a Hampshire police officer; John Rogula, a witness who provided information that the police and prosecutors relied upon to arrest and prosecute Carroccia; Kane County; and the Village of Hampshire.

As a result of the Court's earlier ruling on defendants' motion to dismiss, *see Carroccia v. Anderson*, 249 F. Supp. 2d 1016 (N.D. Ill. 2003), Carroccia's remaining claims are as follows: Count 1, a claim under 42 U.S.C. § 1983 that Carroccia's arrest violated his rights under the

Fourth Amendment; Count 2, a claim under § 1983 regarding an allegedly unreasonable search of his home in violation of the Fourth Amendment; Count 5, a claim under § 1983 that the defendants violated Carroccia's due process rights by withholding exculpatory evidence; Count 6, a claim under § 1983 for conspiracy to violate Carroccia's federal constitutional rights; Count 7, a state law malicious prosecution claim; Count 8, a state law conspiracy claim; and Count 9, a state law claim for intentional infliction of emotional distress. The defendants have moved for summary judgment on all of these claims. For the reasons stated below, the Court grants the defendants' motions.

**Facts**

Because the Court is deciding motions for summary judgment, we view the facts in the light most favorable to Carroccia, the non-moving party. *See, e.g., Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The following statement of facts is taken from matters that Carroccia has conceded or stated in connection with the parties' submissions under Local Rule 56.1.

On the night of June 1, 2000, Sears' body was found, face-down, near his squad car near the intersection of Tang Boulevard and Elgiloy Road in Hampshire. He had been shot three times in the back of the head. Hampshire police officers secured the scene and contacted Chief Atchison. Atchison asked the Illinois State Police to send evidence technicians and asked the Kane County Sheriff to handle the investigation. Captain Anderson of the Kane County Sheriff's Police arrived just after 12:30 a.m. and took control of the crime scene. From that time on, the Kane County Sheriff's Department was in control of the investigation.

Before the Kane County officers arrived, Atchison examined the crime scene and made several observations. These included the fact that the driver's side window of Sears' squad car

was rolled down, the car was still running, the lights were not activated, Sears' flashlight was still in its cradle, his weapon was still holstered, his portable radio was turned off, and there were no entries in the log book that Sears maintained while on duty. Based on these observations and his knowledge of Sears' habits, Atchison believed that Sears had not been investigating a suspicious person or vehicle at the time he was murdered, but rather had gone to the location to meet someone and likely knew his assailant. Atchison reported his belief to Anderson.

Around 11:00 p.m. on June 1, a Kane County detective interviewed two employees of a nearby business who had discovered Sears' body. One of them, Floyd Thompson, reported that he had heard three gunshots and saw a blue mini-van drive away from the crime scene. The other, Mitchell Gossett, reported that around 8:50 p.m., he had heard three gunshots and then saw a mini-van or dark-colored SUV back out from the dead end at Elgiloy Drive.

Anderson assigned Lieutenant Bumgarner to notify Sears' wife, Norma Sears, of his death. Around 12:30 a.m. on June 2, Bumgarner went to the Travel America truck stop, where Norma worked. None of the other defendants were present. Bumgarner asked Norma a number of questions in the presence of Annette Downey, the wife of an Illinois State Police sergeant and a friend of Norma, and two other friends, Paul and Marian Hosick. Bumgarner asked Norma who might have killed her husband. She reported that there was a Hampshire police officer who had been vying for a sergeant's post at the same time as Sears. Downey became angry and told Norma that she shouldn't blame another police officer for Sears' murder. Bumgarner asked for the officer's name; according to the Hosicks, Norma said it could have been any one, as "they were all mad at him," and she specifically mentioned Malloy.

About 2:30 a.m. that same morning, Bumgarner and a Kane County detective went to

3

Norma's residence and again spoke to her. She told Bumgarner that she thought Carroccia had killed her husband, reporting that they had been good friends but had a falling out, and that Sears had been trying to avoid Carroccia.[1]

On the morning of June 2, at Anderson's direction, Bumgarner photographed vehicles in and around Carroccia's residence in Rockford.

Around 11:30 a.m. on June 2, officer Malloy spoke to Bumgarner. Malloy stated that Sears and Carroccia knew each other. He also reported that on an earlier occasion, he had stopped Carroccia after seeing him drive erratically but had not given him a citation. Carroccia had asked for Sears during the stop. Malloy also reported that at Sears' request, he and Sears had switched patrol areas and that Sears had been trying to avoid Carroccia.[2]

On the afternoon of June 2, at Anderson's direction, Bumgarner and other Kane County officers went to two businesses in the area of the crime scene to interview employees who had been working at the apparent time of the murder. Bumgarner interviewed, among others, defendant John Rogula, who reported that on the evening of June 1, he had been working near the open doors of the loading dock of Poli-Film. He stated that during a break around 8:30 p.m., he saw a Hampshire squad car parked on Tang Boulevard, and shortly thereafter he saw an older model, maroon-colored, full-sized van drive up to the squad car and park behind it. He heard

---

[1] The Court disagrees with the suggestion of plaintiff's counsel that "falling out" is an archaic expression. Among other things, a search of Westlaw's "ALLFEDS" data base conducted on August 10, 2004 for any references to "falling out" in federal court decisions since January 1, 1990 produced 584 references. The expression is a common one in current usage.

[2] Carroccia objects that this and a number of other statements in defendants' Local Rule 56.1 submissions are hearsay. The Court disagrees; generally speaking, these statements are not offered for their truth but rather to show what information the officers had at the time of Carroccia's arrest.

three gun shots and saw a man return to the driver's side of the van, get in, and drive away. He described the man as 5'9" to 5'10" tall and weighing 170 to 190 pounds, with bushy dark hair, wearing dark clothes, blue jeans, and a t-shirt. Rogula gave a tape-recorded statement at the Kane County Sheriff's Office, where he was shown the photographs of vehicles that Bumgarner had taken near Carroccia's home, without being told what they were. Rogula identified a van belonging to Carroccia as the vehicle he had seen. No promises were made and no benefits were offered to Rogula by the defendants in connection with his statements,[3] and no suggestions were made to him about what he should say. Rogula was not interviewed by either Atchison or Malloy.

Anderson ran a driver's license check on Carroccia and learned that his license stated that he was 5'8" tall and weighed 165 pounds. After Bumgarner reported to Anderson regarding his interview of Rogula, Anderson made the decision to arrest Carroccia. He was taken into custody around 6:30 p.m. on June 2 and was transported to the Kane County Sheriff's Office. It is undisputed that on that date, Carroccia was 5'8" tall, weighed 195 pounds, and had bushy dark hair.

Anderson and Atchison interviewed Carroccia at the Sheriff's Office. Carroccia denied killing Sears. He denied that he had been at the crime scene but stated that he was familiar with the location and had been there with Sears before. He reported that he owned a number of guns, including a .38 Smith and Wesson revolver, and a gun he described as a "wheel gun," a .38 revolver that with a cylinder that rotates like a wheel (it is not entirely clear to the Court from the

---

[3] There is evidence that several days later, Rogula told Floyd Thompson that he had provided information about the murder to "Crime Stoppers" and was going to get a reward. However, Carroccia has offered no evidence that the defendants were aware of this.

5

parties' submissions whether Carroccia contends he was referring to a single .38 caliber gun or two different guns). Carroccia also stated that he was a friend of Marilyn Vogelman, apparently Sears' long-time girlfriend before his marriage to Norma, and that Sears had "hid [Vogelman] away" during their relationship and prevented other people from getting to know her. Anderson asked Carroccia how he would explain it if testing showed gunshot residue on his hands. Carroccia stated that if that were so, he likely had picked it up from handling some shells the previous night or from a friend's business where there was gunpowder and chemicals, but that he had not fired a gun recently. Sears also gave an account of his whereabouts on the night of June 1.

On the evening of June 2, Kane County Assistant State's Attorney Joseph Cullen arrived at the Sheriff's Office and began to gather information about the case. He was told by investigators that Sears was shot three times in the head; it appeared from the crime scene that he knew his assailant; several witnesses heard shots and saw a vehicle; Rogula appeared to have seen more than the others and described a white man, between 5'7" and 5'9" tall and between 170 and 190 pounds with curly brown hair; Rogula identified Carroccia's van as the vehicle he had seen; Norma Sears stated that her husband and Carroccia were friends but had a falling out; and Malloy reported Sears saying that he was trying to avoid Carroccia. Anderson and Atchison reported to Cullen regarding their interview of Carroccia. Cullen also interviewed Carroccia and concluded that he met the description provided by Rogula. Cullen authorized the filing of a murder charge.

Assisted by Cullen, Bumgarner prepared an affidavit in support of a request for a warrant to search Carroccia's home. There is no evidence that Atchison, Malloy, or Anderson had any

involvement in this process. The affidavit contained an error; it identified Floyd Thompson rather than John Rogula as one of the two witnesses who had seen "a full size van" in the area of the police car. Dfdt. Ex. JJ, ¶ 12. At 12:15 a.m. on June 3, a Kane County judge issued the requested warrant, and Kane County officers executed the warrant around 1:00 a.m.

Anderson assigned a Kane County detective, Sergeant Chris Peeler, to execute the warrant. The Sheriff's police gained entry into Carroccia's house by kicking in a door, a decision made by Peeler. Neither Anderson, Bumgarner, Anderson, nor Malloy participated in or supervised the execution of the warrant, and none of them gave any instructions or had anything to do with the manner of entry. The police recovered approximately fifty firearms, none of which was a .38 caliber gun, though they did recover some .38 caliber ammunition. They also recovered three pairs of blue jeans and three t-shirts that were hanging up to dry but were still wet, suggesting they had been washed recently. The police also found a card sent to Carroccia by Marilyn Vogelman that made reference to the fact that they had "been cheated out of friendship time." Dfdt. Ex. MM.

On June 16, 2000, the Illinois State Police Crime Laboratory reported that the bullet fragments recovered from Sears' body were .38 class ammunition. During the month of June, investigators checked out Carroccia's alibi and obtained information that, they believed, suggested that some of the information he had given was incorrect.

As noted earlier, Carroccia was acquitted by a jury at trial.

## Discussion

1.  **Count 1 - Fourth Amendment claim concerning Carroccia's arrest[4]**

The defendants argue that probable cause existed to arrest Carroccia. The issue is whether, at the time of the arrest, the reasonably trustworthy information known to the officers was sufficient for a reasonable person to believe that Carroccia had killed Sears. *E.g., Hunter v. Bryant*, 502 U.S. 224, 228 (1991).

Based on the facts Carroccia concedes were known to the defendants, probable cause plainly existed. The crime scene suggested that Sears knew his killer and was not investigating anything suspicious at the time of the murder. Carroccia knew Sears. Norma Sears reported that Carroccia and Sears had a falling out, and defendant Malloy reported that Sears had been trying to avoid Carroccia. Witnesses whom the police had no reason to disbelieve reported hearing three gunshots and seeing a van drive away that one of them identified as Carroccia's van and that at least generally matched descriptions given by the others. One of those witnesses reported seeing the person who, it was reasonable to believe, had killed Sears, and he gave a description that generally matched Carroccia. This information, the defendants' knowledge of which is undisputed by Carroccia, was sufficient to establish probable cause as a matter of law, *see, e.g., United States v. Tilmon*, 19 F.3d 1221, 1228-29 (7th Cir. 1994); no reasonable jury could find otherwise. Even if somehow insufficient to establish probable cause, this evidence at least established "arguable probable cause," *see Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir.

---

[4] Carroccia's Fourth Amendment claim against the officers necessarily is confined to the legality of his arrest; the Seventh Circuit has held that malicious prosecution – the making of a false charge in court – does not give rise to a claim of a federal constitutional deprivation. *See Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001).

1998), entitling the defendants to qualified immunity.

Carroccia make several arguments on the probable cause issue, none of which have merit. First, he says that the crime scene could have been interpreted to suggest that Carroccia had been surprised by his assailant, and not necessarily that he knew the assailant. That misses the point. Probable cause does not require proof beyond a reasonable doubt, or even by a preponderance of the evidence. *See Braun v. Baldwin,* 346 F.3d 761, 766 (7th Cir. 2003). The question with regard to the crime scene is not whether other inferences might have been drawn, but rather whether the inference the officers drew was a reasonable one. It was.

Second, Carroccia says that Norma Sears identified others, including Malloy and other police officers, as possible assailants. In finding that probable cause existed, the Court has not relied on Norma's claim that Carroccia might be the killer. That aside, the fact that she also named others does not undercut the probable cause showing regarding Carroccia. Carroccia offers nothing to suggest that Norma had, or gave the officers, information actually pointing to the involvement of any other person, or that the officers had any indication that she was doing anything other than speculating. But in any event, of the people Norma referenced, the police had information arguably tying Carroccia (but not others) to the crime – namely the reports of Rogula, Gossett, and Thompson. Though the defendants do not appear to have pursued the possibility that other police officers might have been involved in Sears' murder, the Fourth Amendment does not require the police to pursue all investigative possibilities to establish probable cause. *See Carroccia,* 249 F. Supp. 2d at 1025 (citing *Gramenos v. Jewel Cos.,* 797 F.2d 432, 442 (7th Cir. 1986)).

Carroccia contends that Bumgarner concealed Norma's claim that other officers might

9

have been responsible for her husband's murder. The evidence in fact suggests that Bumgarner did not report to his colleagues or prosecutors that Norma had made this claim. But because Carroccia has offered no evidence that Norma was doing anything other than speculating, Bumgarner's nondisclosure of this information is of no consequence in determining whether probable cause to arrest and charge Carroccia existed. Carroccia has offered no evidence that Bumgarner or the other defendants shaded any of the other information they obtained, tried to influence witnesses, or concealed any material information in order to divert focus from fellow officers or onto Carroccia.

Next, Carroccia points out that there were discrepancies between the witnesses' descriptions of the vehicle they had seen. Variances in descriptions given by eyewitnesses are common. In this case, none of the other witnesses' descriptions as conveyed to the defendant officers undercut Rogula's positive identification of Carroccia's vehicle as the one he had seen.

Carroccia also argues that the police should have done more to check Rogula's veracity before relying on his statements. He says that if they had done so, they would have learned that Rogula had a questionable reputation for truthfulness, a history of involvement in criminal activity, and a belief that he would get a reward for providing information. But Carroccia has no evidence that the defendants had any of this information at the time of his arrest or the imposition of charges, or that anything in Rogula's statements or demeanor at his interviews should have caused them to doubt his credibility. Absent something along these lines, or some flaw in what Rogula reported that was apparent to the defendants, they were not required to take steps to corroborate his statements before relying on them to establish probable cause. *See, e.g., Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 524-25 (7th Cir. 2001); *Spiegel v.*

*Cortese*, 196 F.3d 717, 724-25 (7th Cir. 1999).

Finally, Carroccia says that the defendants rushed to judgment, charging him based on incomplete information when a more thoughtful and thorough process might have led to a different result. He says that more could have and should have been done to follow up on other persons he identifies as possible suspects, including Norma Sears, Marilyn Vogelman, officer Malloy, or other Hampshire officers. Perhaps so, but as indicated above, the officers' failure to pursue other leads in no way diminishes the showing of probable cause that supported the arrest of Carroccia.

For these reasons, the defendants are entitled to summary judgment on Count 1.

## 2. Count 2 - Fourth Amendment claim regarding search of home

With regard to the search, it is undisputed that none of the defendant officers had anything to do with the manner in which the warrant was carried out, specifically the decision to kick in a door to Carroccia's home. The element of personal involvement that is a prerequisite to liability under § 1983 is lacking as to each of the individual defendants regarding this claim. *See, e.g., Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986) (§ 1983 liability depends on defendant's personal involvement in constitutional violation); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (personal responsibility requires participation or direction, or at least knowledge and consent). Carroccia argues that the defendants had his house keys and should have given them to the officers. Assuming this is true, the defendants may well have been negligent, but these facts do not support a claim of liability under § 1983 for violation of the Fourth Amendment.

Carroccia alleges that Bumgarner's affidavit that was used to obtain the search warrant

contained false information. From Carroccia's memorandum opposing defendants' summary judgment motions, it appears that his contention is actually that Bumgarner included false information that witnesses had provided. *See* Pltf. Summ. Judg. Resp. at 8-9. But § 1983 liability in this context requires proof that the officer intentionally or at least a recklessly misstated or omitted a fact material to the showing of probable cause. *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir. 1985) (applying *Franks* in the civil context). Carroccia makes no claim that Bumgarner knowingly included any material false information (the misstatement of one witness's name was concededly unintentional and in any event immaterial); his claim is that Bumgarner acted recklessly because he and others had not corroborated the information in the affidavit. But mere lack of corroboration does not make a statement reckless under *Franks*; the recklessness that is required is reckless disregard of the statement's truth. *Franks*, 438 U.S. at 155-56. Carroccia has offered no evidence from which a reasonable juror could conclude that Bumgarner recklessly disregarded the truth of any of the statements in his affidavit. The defendants are entitled to summary judgment on Count 2.

### 3. Count 5 - Fourteenth Amendment due process claim regarding concealment of exculpatory evidence

In Count 5, as the Court construed it in ruling on the defendants' motions to dismiss, Carroccia claims that the defendant officers concealed exculpatory evidence from Kane County prosecutors and misled them about investigative facts. *See Carroccia*, 249 F. Supp. 2d at 1022. As noted in that ruling, Carroccia can make out a claim for violation of his federal constitutional rights only if he can show that the "'officers withheld information or evidence necessary for the fair and impartial trial guaranteed by the U.S. Constitution.'" *Carroccia*, 249 F. Supp. 2d at

1023 (quoting *Ienco v. City of Chicago*, 286 F.3d 994, 999 (7th Cir. 2002)). This requires a showing that the withheld information was material, in that there is a reasonable probability that it could have affected the outcome of the trial. *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Carroccia's acquittal, the Court ruled, does not bar him from bringing a claim; the question of whether withheld information could affect the trial's outcome must be examined as of the time of the alleged concealment rather than in hindsight. *Id.* at 1024.

The Court has searched Carroccia's responsive memorandum in vain for anything supporting his claim that material exculpatory information was withheld from prosecutors or from Carroccia's defense. His argument on this claim consists of two sentences: "The defendants also contend that [*Brady v. Maryland*] was respected because there is no evidence that they knew any witnesses provided false statements or that they knowingly misled prosecutors. The record, however, is to the contrary; at least fact questions remain for resolution by the fact finder." Pltf. Summ. Judg. Resp. at 10. This is not a particularly helpful argument without some elaboration.

Looking at the remainder of Carroccia's memorandum, only two points are suggestive of a claim of concealment of information favorable to Carroccia from prosecutors. The first is the previously referenced statement by Norma Sears suggesting that someone in the Hampshire Police Department might be responsible for her husband's death. But as discussed above, Carroccia offers nothing to suggest that Norma was voicing anything other than her own speculation or that she had any real information pointing to anyone in particular. The second matter noted by Carroccia concerns Rogula. Carroccia argues near the end of his memorandum that "fact questions exist as to whether Rogula was fed the information that produced Carroccia's

arrest." Pltf. Summ. Judg. Mem. at 10. But Carroccia does not squarely identify what information he says was "fed" to Rogula. The closest he comes is the following statement that appears several pages earlier in his memorandum: "It is consistent with the above that the photo spread shown to Rogula, which allowed him to fine-tune his false description of the murder van (it no longer had a spare tire or tire rack on the rear, only a sticker) consisted of one vehicle, the plaintiff's." Pltf. Summ. Judg. Mem. at 5. However, any claim that the police knowingly or even recklessly caused Rogula to fabricate evidence inculpatory of Carroccia in this regard is foreclosed by Carroccia's admissions to each of the following statements in Anderson and Bumgarner's Rule 56.1 statement of material facts:

> 76. Rogula described the van as an older model full-sized van, maroon in color with surface rust, a flat window on the passenger's side and a light color license plate with a stripe on it.
>
> ...
>
> 87. Among other things, Rogula stated in the tape-recorded interview that he heard three gunshots and saw a full sized maroon color van parked behind a patrol car.
>
> 88. Rogula stated that the van had a window on the side and a light colored Illinois license plate with a stripe across the top like an Illinois plate.
>
> 89. Rogula described the van as having a dull, sun-burnt or weathered finish.
>
> ...
>
> 93. Bumgarner then showed Rogula photographs of several vehicles owned by Plaintiff John Carroccia that Bumgarner had taken earlier in the day.
>
> 94. Rogula stated that the van he saw on June 1st was the van, or very similar to the van, depicted in the photos.
>
> 95. The photos of Plaintiff's van depicted a faded maroon color full-

14

sized utility style van with surface rust, a side window on the passenger side and a light color Illinois license plate.

> 96. Bumgarner never suggested to Rogula that he was looking for a certain type, make or color of vehicle.
>
> 97. Rogula at all times volunteered the information as to the color and other characteristics of the van without any suggestions or prompting or details given by Bumgarner.
>
> 98. Rogula did not know Plaintiff or what type of vehicles he drove.
>
> 99. Bumgarner did not show Rogula the photographs of Plaintiff's van until after he had been interviewed at Poli-film and after his statements were tape-recorded at the Burlington substation.

Anderson / Bumgarner LR 56.1 Stmt. ¶¶ 76, 87-89, 93-99 (citations to record omitted). In view of Carroccia's admission of these facts, no reasonable jury could find that the defendants had consciously fed inculpatory information to Rogula, let alone that they concealed exculpatory information from prosecutors or the defense regarding the circumstances of Rogula's photographic identification of the van.

For these reasons, the defendants are entitled to summary judgment on Count 5.

### 4. Count 6 - claim of conspiracy to violate federal constitutional rights

The Court's determination that probable cause existed to arrest Carroccia, that none of the defendants had any involvement in any violation of the constitutional prohibition against unreasonable searches, and that none of them withheld material exculpatory evidence is fatal to Carroccia's claim that they participated in a conspiracy to deprive him of his constitutional rights. Defendants are entitled to summary judgment on Count 5.

### 5. Count 7 - state law malicious prosecution claim

A claim of malicious prosecution under Illinois law requires, among other things, proof of

the absence of probable cause, *see, e.g., Swick v. Liautaud,* 169 Ill. 2d 504, 512, 662 N.E.2d 1238, 1242 (1996), measured at the time criminal charges are commenced. *See, e.g., Mack v. First Security Bank,* 158 Ill. App. 3d 497, 502, 511 N.E.2d 714, 717 (1996). The Court has already found as a matter of law that probable cause existed to arrest Carroccia. There is no evidence from which a jury could find that probable cause had dissipated by the time he was charged, one day after his arrest. Specifically, no evidence had come to the attention of the defendants or the authorities between the arrest and charging of Carroccia that undercut the existence of probable cause. Defendants are therefore entitled to summary judgment on Count 7.

### 6. Count 8 - state law conspiracy claim

A claim of civil conspiracy under Illinois law requires proof of a combination of two or more persons, for the purpose of achieving an illegal object or a legal object by illegal means, and an overt tortious or unlawful act by one of the conspirators in furtherance of the conspiracy. *See Fritz v. Johnston,* 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004). Our conclusions on the claims we have already discussed preclude any basis for a claim that any of the defendants committed a tortious or unlawful act, or that they sought to achieve an illegal object or undertook illegal means to achieve a legal object. Defendants are entitled to summary judgment on Count 8.

### 7. Count 9 - state law claim of intentional infliction of emotional distress

The Court has concluded that the evidence establishes as a matter of law that probable cause existed supporting Carroccia's arrest and prosecution and that there is no evidence from which a reasonable jury could find that the defendants concealed material evidence exculpatory of Carroccia. Under the circumstances, his arrest and prosecution could not possibly rise to the

level of "extreme and outrageous" conduct required to support a claim under Illinois law for intentional infliction of emotional distress. *See, e.g., McGrath v. Fahey,* 126 Ill. 2d 78, 86, 533 N.E.2d 806, 809 (1989) (identifying elements of claim for intentional infliction of emotional distress).

### 8. Claims against Kane County and Village of Hampshire

Because Carroccia has failed to support his claims that his constitutional rights were violated, he cannot maintain a claim under § 1983 against either Kane County or the Village of Hampshire.[5] *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (per curiam). The Court's determination that Carroccia has failed to support his state tort claims is likewise fatal to his claims against the municipal entities under state law for their employees' alleged torts.

### 9. Claims against Rogula

Rogula has filed a separate motion for summary judgment. Carroccia does not address that motion separately in his memorandum. He has provided no basis for a § 1983 claim against Rogula, a private citizen, which would require evidence from which a jury could conclude that he had conspired or acted in concert with a governmental actor to violate Carroccia's constitutional rights. *See, e.g., Dennis v. Sparks,* 449 U.S. 24, 27-28 (1980); *Williams v. Seniff,* 342 F.3d 774, 785 (7th Cir. 2003). He likewise has provided no basis for maintaining a state law claim against Rogula, which as best as the Court can tell would require evidence from which a reasonable jury could conclude that he had knowingly fabricated information. Rogula is entitled to summary

---

[5] Carroccia conceivably could show that officers other than the individual defendants violated his Fourth Amendment rights in executing the search warrant at his home. But he offers no evidence that this was done pursuant to a policy or custom of either Kane County or the Village of Hampshire, as is required to establish a claim against a municipal entity under § 1983. *See generally Monell v. Dep't of Social Services of City of New York,* 336 U.S. 658, 694 (1978).

17

judgment.

## Conclusion

For the reasons stated above, the Court grants the defendants' motions for summary judgment [docket # 68-1, 73-1, 80-1]. The Clerk is directed to enter judgment in favor of the defendants. The trial date of November 1, 2004 is vacated.

															   _____
															   MATTHEW F. KENNELLY
															   United States District Judge

Date: August 24, 2004